UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| DIANA EVERROAD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-770-RLY-JMS |
| | ) | |
| SCOTT TRUCK SYSTEMS, INC. and | ) | |
| SHERRY (SCOTT) HANTZIS, in her | ) | |
| Individual capacity, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Diana Everroad ("Plaintiff"), brought this action against her former employer and former supervisor, Scott Truck Systems, Inc. ("Scott Truck") and Sherry (Scott) Hantzis ("Hantzis") (collectively "Defendants"), as a result of her termination. Plaintiff alleges that she was terminated because of her gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  Plaintiff also brings retaliation claims under both Title VII and the ADEA, alleging that she was terminated for complaining about sex and age discrimination.  In addition to her federal claims, Plaintiff brings claims for wrongful termination, negligent retention, assault, and intentional infliction of emotional distress under Indiana state law. Defendants now move for summary judgment on all of Plaintiff's claims.  For the reasons set forth below, the court **GRANTS** Defendants' motion on Plaintiff's Title VII and

1

ADEA claims.  The court declines to exercise supplemental jurisdiction over Plaintiff's

state law claims, and, accordingly, those claims are **DISMISSED WITHOUT**

**PREJUDICE**.

I.      **Statement of Facts**

        A.      **Background**

1.      Plaintiff is a female who was born in 1953.  (Complaint ¶ 10).  She was

        undisputably over the age of forty when she was terminated.

2.      Scott Truck is a family-owned, commercial trucking company based in Whiteland,

        Indiana.  (Declaration of David Scott ("Scott Decl.") ¶¶ 2, 4, Defendants' Ex. A).

        David Scott owns and is president of Scott Truck, and his wife, Sherry Hantzis, is

        the general manager.  (Scott Decl. ¶ 4).

3.      In the spring of 2004, Plaintiff applied for a position as a dispatcher with Scott

        Truck.  (Deposition of Diana Everroad ("Everroad Dep.") 43, Defendants' Ex. D

        and Plaintiff's Ex. A; Declaration of Sherry Hantzis ("Hantzis Decl.") ¶ 6,

        Defendants' Ex. C).

4.      Three other individuals applied for the dispatcher position—Tim Wilson, age 40,

        Dennis Wilder, age 50, and Tina Skadra, age 24.  (Hantzis Decl. ¶¶ 5–6; Everroad

        Dep. 49–50).

5.      Upon Hantzis' recommendation, Scott hired Plaintiff for the dispatcher position.

        (Scott Decl. ¶ 5).

**B.      Plaintiff's Position as a Dispatcher**

6.      Plaintiff began working for Scott Truck as a dispatcher on May 17, 2004.

(Everroad Dep. 48).

7.      Plaintiff's job responsibilities as a dispatcher included: helping and

communicating with Defendants' truck drivers, pairing customer loads with

Defendants' drivers and trucks, and ensuring Defendants' drivers turned in their

required paperwork.  (Deposition of Sherry Hantzis ("Hantzis Dep.") 54–55,

Defendants' Ex. B).  As a dispatcher, Plaintiff was in frequent contact with

Defendants' drivers and customers.  (Hantzis Decl. ¶ 7).

8.      Shortly after Plaintiff began working for Scott Truck as a dispatcher, Hantzis

began receiving complaints from employees and customers.  (Hantzis Dep.

63–64).

9.      Her supervisor, Jim Moore, repeatedly complained to Hantzis that Plaintiff was not

"getting it," meaning that she was not properly understanding the aspects of her

job.  (Hantzis Dep. 63–64).

10.      Jim Moore was initially responsible for training Plaintiff, but after Plaintiff

complained that he refused to train her, Scott took over.  (Everroad Dep. 59–60).

Once Scott took over training Plaintiff, she testified that everything went fine.

(Everroad Dep. 61).

11.      However, Hantzis and Scott continued to receive complaints about Plaintiff from

customers, including two of Scott Truck's biggest customers.  (Scott Decl. ¶¶ 7–9).

12.     Plaintiff also had interpersonal conflicts with other Scott Truck employees while she was working as a dispatcher.  (Scott Decl. ¶ 10).

13.     In particular, she had problems with one of Scott Truck's drivers, Tim Wilson ("Wilson").  (Scott Decl. ¶ 10).  On one occasion, when she was still dispatching, Plaintiff approached Wilson to speak with him, and the two started arguing. (Everroad Dep. 88–95; Hantzis Dep. 107).  Wilson told Plaintiff that he did not think that Plaintiff was a good dispatcher and should not have been hired for the job.  (Everroad Dep. 89–91).  Wilson referenced the fact that he did not like the number of females being hired at the company and that the men working there preferred the company when it was all men.  (Everroad Dep. 91).  It is not clear whether Plaintiff's supervisor, Jim Moore, heard this comment, but Plaintiff did not tell Hantzis or Scott about it.  (Everroad Dep. 91–92, 94–95).

14.     Scott and Hantzis heard them arguing and called them into Scott and Hantzis' shared office.  (Hantzis Dep. 106).  Plaintiff told them that Wilson said she could not do her job and he did not want her to do the job; Scott and Hantzis asked Plaintiff to leave so they could talk to Wilson privately; and ultimately, Hantzis told Wilson that as long as Plaintiff was a dispatcher, he was required to work with her.  (Hantzis Dep. 107–09).

15.     During the meeting between Scott, Hantzis, Wilson, and Plaintiff, Wilson asked a number of times, "Can I leave now?"  (Everroad Dep. 95).  Hantzis said "no," he could not leave until the meeting was over.  (Everroad Dep. 95).

4

16.    She also had problems with another driver, John Mulligan ("Mulligan").

(Everroad Dep. 96–97).  Mulligan was a friend of Scott and Hantzis, who, as

Hantzis describes, has a booming voice and sarcastic wit.  (Scott Decl. ¶ 12;

Hantzis Decl. ¶ 12).

17.    On one occasion, when Plaintiff was working dispatch after hours, Mulligan called

Plaintiff and started screaming at her, demanding to speak to Jim Moore.

(Everroad Dep. 98).  Plaintiff explained that she was on her cell phone and was

unable to switch him over to Jim.  (Everroad Dep. 98).  Mulligan continued to

scream at her, and ultimately, Plaintiff had to call Jim Moore, explain the situation,

and have him call Mulligan back.  (Everroad Dep. 98–99).

18.    During another incident, Mulligan called the office, and when Plaintiff answered,

he started yelling about his load and the Chicago traffic.  (Everroad Dep. 100).

Mulligan demanded to speak with Scott, so Plaintiff transferred the call to Scott.

(Everroad Dep. 100).

19.    A third incident occurred when Plaintiff was at the office after hours.  Mulligan

came to the office with a dolly loaded with cases of soda.  (Everroad Dep. 101).

He started banging on the door to get in, and when Plaintiff opened the door for

him, he slammed it open.  (Everroad Dep. 101).

20.    When Plaintiff later confronted Mulligan about the third encounter, she told him

that she would call 911 if he ever forced his way into the office again.  (Everroad

Dep. 104).  This confrontation occurred in July or August 2004, when Plaintiff was

still a dispatcher.  (Hantzis Decl. ¶ 11).  Mulligan and Plaintiff started arguing, during which time Mulligan made a reference to Plaintiff "PMSing;" Mulligan took a step toward Plaintiff, and Plaintiff told him to get out of her face.  (Everroad Dep. 104–05).[1]

21.  Plaintiff told Scott and Hantzis about this incident with Mulligan, including the "PMS" comment.  (Everroad Dep. 112, 321, 328–30).[2]  Scott spoke to Mulligan about being more "careful" when dealing with Plaintiff.  (Hantzis Decl. ¶ 13).  Mulligan was apologetic and receptive to Scott's suggestions.  (Hantzis Decl. ¶ 13).

22.  On one occasion, Plaintiff's husband, also an employee at Scott Truck, witnessed Mulligan yell at Scott.  (Affidavit of Jim Everroad ("J. Everroad Aff.") ¶ 8, Plaintiff's Ex. C).[3]  During another incident, Mulligan came into the office visibly

---

[1] Plaintiff recorded this conversation between Mulligan and herself and attached a transcript of it as evidence in response to Defendants' summary judgment motion.  However, the court will not consider either this transcript or the transcript of the August 29, 2005, meeting between Plaintiff, Hantzis, and Scott as evidence.  First, a transcript is not evidence of what was said in a conversation.  *Stringel v. Methodist Hosp. of Ind.*, 89 F.3d 415, 420 (7th Cir. 1996) ("[I]t is the tape recording of the conversation that constitutes evidence of what was said, not the transcript.").  Also, the relevancy and accuracy of the transcripts and recordings are called into question by the fact that the recordings of both conversations are largely inaudible, and Plaintiff does not know whether the recordings are complete recordings of the entire conversations.  (Everroad Dep. 127, 252).

[2] Defendants dispute that Plaintiff told Scott and Hantzis about the "PMS" comment.  However, Plaintiff's deposition testimony indicates otherwise:  "Q: . . . John Mulligan had made a statement to you regarding . . . whether or not you had PMS and he didn't give a shit? A: Yes.  Q: Did you make that statement known to Sherry and Dave?  A: Yes."  (Everroad Dep. 321)

[3] Defendants object to paragraph 8 of Jim Everroad's Affidavit on the ground that it is a bald legal conclusion rather than a statement of fact about which he has personal knowledge.

upset, and when Hantzis asked what the problem was, he began yelling about

something a mechanic had done.  (Hantzis Dep. 42).  Mulligan then peeled out of

the parking lot in his truck and then came back.  (Hantzis Dep. 44).

23.    In Scott's opinion, Mulligan had never yelled at nor been insubordinate to him.

(Scott Decl. ¶ 12).

### C.    Plaintiff's Position as a Data Administrator

24.    Based on the complaints Defendants had received from Scott Truck customers and

the interpersonal conflicts she was having with other Scott Truck employees,

Hantzis created a position for Plaintiff as a Data Administrator in August 2004.

(Hantzis Decl. ¶¶ 14–15; Scott Decl. ¶¶ 13–14).

25.    In this position, Plaintiff's duties included filing, tracking certain information for

payroll purposes, performing data entry, and screening the public.  (Everroad Dep.

144–47).  This position required Plaintiff to have less contact with customers and

other Scott Truck employees.  (Hantzis Decl. ¶ 15).

26.    Plaintiff's salary remained the same, and her hours became a little more flexible.

(Everroad Dep. 141).

### E.    Plaintiff's Conflicts with her Office Mate

27.    In her new position, Plaintiff shared an office with Jennifer Sasser ("Sasser"), an

---

Paragraph 8 reads: "I personally witnessed John Mulligan verbally screaming at Dave Scott in a loud and humiliating manner while employed at STS.  Mulligan's speech included a substantial amount of profanity."  While Jim Everroad would not have personal knowledge of Scott's feelings, i.e. whether he was humiliated by Mulligan, the court finds admissible the fact that Mulligan was yelling at Scott because Everroad personally witnesses the verbal intercourse.

hourly Scott Truck employee.  (Hantzis Decl. ¶¶ 16, 18).

28.   Sasser was twenty-eight when Plaintiff and she started sharing an office and twenty-nine when Plaintiff was terminated.  (Hantzis Decl. ¶ 16).

29.   After Scott and Hantzis moved around the office furniture to create a workspace for Plaintiff and Sasser, Scott and Hantzis discovered that there was only one telephone port in the shared office.  (Hantzis Decl. ¶ 18).  Thus, a second phone could not be added without considerable expense.  (Scott Decl. ¶ 17).  Because Plaintiff's new position did not require her to be on the phone often and because there was a telephone in the lobby available for her use, Hantzis and Scott did not add a second line, and the existing telephone was placed on Sasser's desk. (Hantzis Decl. ¶ 18).

30.   Sasser's job duties included burning CDs of books on tape into a Scott Truck database so Defendants' truck drivers could listen to them on the road.  (Hantzis Dep. 51).  This job required little concentration, and Sasser had significant downtime.  (Hantzis Decl. ¶ 16).

31.   In 2004, Sasser had a number of health issues and her father was dying from cirrhosis.  (Hantzis Dep. 53).  As a result, Sasser often made personal calls from her office phone during her downtime at work.  (Hantzis Dep. 74).

32.   Scott Truck permits its employees to make personal calls during the work day. (Hantzis Dep. 74).

33.   Around July 2005, Plaintiff complained to Scott and Hantzis that Sasser's personal

calls were annoying her and were difficult to listen to all the time.  (Everroad Dep. 174–75).

34.   Hantzis then spoke to Sasser about Plaintiff's complaints and told her while she was free to make personal calls at work, she needed to be considerate of the fact that Plaintiff could hear all of Sasser's telephone conversations.  (Hantzis Dep. 74–75).  Hantzis further told Sasser that for extended phone calls, she may want to consider using the lobby phone or using her cell phone outside of the shared office. (Hantzis Dep. 76).

35.   A few days after this meeting with Hantzis, Sasser again began a pattern of making personal calls.  (Everroad Dep. 181).  However, Plaintiff did not complain about this until her interruption of the August 26, 2005, meeting referenced below. (Everroad Dep. 181–83).

36.   In late August 2005, the long-time boyfriend of Plaintiff's sister had a heart attack and remained very ill.  (Everroad Dep. 183–84).  Plaintiff became very stressed after being in the hospital visiting her sister's boyfriend, and then having to come to work and listen to Sasser talk on the phone about her father's health problems. (Everroad Dep. 184).

37.   On August 26, 2005, Sasser was on the phone to her father in the office she shared with Plaintiff and was "telling him how to poop."  (Everroad Dep. 185).  This promulgated Plaintiff to walk into Hantzis and Scott's office, interrupt their discussion with Jim Moore, sit down in a chair, and say something like, "It's Jenni

9

[Sasser], she's at it again . . . I have too much going on in my personal life to deal with her."  (Hantzis Dep. 69–70).

38.    Hantzis responded that if Plaintiff had things in her personal life which she needed to address, she was welcome to take time off to address them.  (Hantzis Dep. 81).  Hantzis knew that Plaintiff's sister's boyfriend was critically ill and that Plaintiff may need some time off the following week.  (Everroad Dep. 193–94).  After Hantzis made the statement to Plaintiff about needing time off, Plaintiff left Scott and Hantzis' office.  (Hantzis Dep. 82).

39.    About an hour after Plaintiff left Scott and Hantzis' office, Hantzis came to Plaintiff's work area and asked her if she wanted to talk about what happened earlier.  (Hantzis Dep. 86; Everroad Dep. 195).  Plaintiff said "Not now, Sherry [Hantzis]."  (Everroad Dep. 195).

40.    At the end of the day, Plaintiff wrote down a detailed list of her complaints about Sasser and showed it to Scott, telling him that was everything she had to listen to for fifteen months.  (Everroad Dep. 197).

**F.    The August 29, 2005, Meeting**

41.    Over the weekend, Scott and Hantzis discussed Plaintiff's reaction to their offer for time off and the situation between Plaintiff and Sasser, including Plaintiff's list of complaints about Sasser.  (Hantzis Dep. 89–90).  Ultimately, Hantzis drafted a letter to Plaintiff and Sasser, a copy of which was placed on both of their desks, asking them to report to Scott and Hantzis' office that Monday morning to discuss

their concerns.  (Hantzis Dep. 89–90, 137).

42.   On Monday morning August 29, 2005, Hantzis, Scott, Plaintiff, and Sasser met in Scott and Hantzis' office.  (Scott Decl. ¶ 20; Hantzis Decl. ¶ 23).  Scott commenced the meeting by stating that they were gathered to resolve a conflict. (Everroad Dep. 207).

43.   Plaintiff and Sasser both stated that they did not realize there was a conflict. (Everroad Dep. 207).  Plaintiff elaborated that, to her, voicing concerns over Sasser's behavior was not a conflict.  (Everroad Dep. 208).  Because Hantzis and Scott called the meeting, in part, to address Plaintiff's complaints about Sasser (which they perceived was a conflict), they asked Sasser to leave so they could discuss with Plaintiff the fact that a conflict existed.  (Hantzis Dep. 138).

44.   The meeting between Plaintiff, Hantzis, and Scott lasted six and a half hours. (Everroad Dep. 206).  During the meeting, Plaintiff's behavior included the following: asking "what am I here for?"; rolling her eyes at Hantzis; when asked not to roll her eyes, responding that "I'm allowed to have facial expressions."; in response to a comment by Hantzis, throwing her arms up and yelling, "Jeez!"; when Hantzis confirmed something Plaintiff said earlier in the meeting, responding, "I don't need your confirmation."; asking, "Is this a meeting or a chew-out meeting?"; telling Hantzis, "It doesn't matter what I say.  You're going to put a spin on it."; and comparing Sasser's continual phone conversations about her father's cirrhosis to the scene in the movie *Forrest Gump* where the character

11

Bubba rambles on about the different ways to cook shrimp.  (Hantzis Decl. ¶¶ 25, 28).

45.   By the end of the meeting, which Sasser eventually rejoined, certain proposals had been set forth to allow Plaintiff and Sasser to coexist peacefully in their office. (Hantzis Dep. 141–42).  These proposals included: Sasser never touching Plaintiff, Sasser not using medical phrases in the office, Sasser refraining from having any personal conversations in the shared workspace, and Plaintiff making a slicing gesture across her neck when Sasser was annoying her.  (Hantzis Dep. 141–42).

46.   After the meeting, Hantzis started making a list of the proposals, but she and Scott decided that allowing Plaintiff to make a slicing gesture to Sasser would be a bad precedent to set.  (Hantzis Dep. 141).

47.   Upon further discussion of Plaintiff's behavior in the August 29, 2005, meeting, during which Hantzis and Scott agreed Plaintiff was insubordinate, they discussed their options in dealing with Plaintiff's behavior.  (Hantzis Decl. ¶¶ 25, 26; Scott Decl. ¶ 22; Hantzis Dep. 142, 144).

48.   Hantzis and Scott decided that they could terminate Plaintiff for her behavior towards them in the meeting, eliminate her position as part of an anticipated reduction-in-force, or invest the time and energy to resolve the conflict between Plaintiff and Sasser.  (Hantzis Dep. 146–47).  They continued to discuss these options that Monday evening and Tuesday night.  (Hantzis Dep. 145).

### G.      Defendants Terminate Plaintiff

49.      On Wednesday morning, August 31, 2005, Scott and Hantzis entered the office

and passed Plaintiff's workstation.  (Hantzis Dep. 147).  When they walked by,

Plaintiff had her back to them.  (Hantzis Dep. 147–48).  Hantzis said, "Good

morning, Diane.", but Plaintiff did not respond.  (Hantzis Dep. 148).  Then Scott

greeted her, and, as Hantzis testified, Plaintiff threw herself around in an

exaggerated manner, and said "Oh, I'm sorry.  I didn't know anybody was back

there.  Good morning."  (Hantzis Dep. 148).

50.      As Scott and Hantzis walked away, Scott and Hantzis agreed that Plaintiff

pointedly ignored Hantzis and, at that moment, they decided to terminate her.

(Hantzis Dep. 148).

51.      After they talked to their lawyer, Scott notified Plaintiff at the end of that day they

were terminating her employment.  (Scott Decl. ¶ 25).  Plaintiff became very upset

and began insulting Scott and Hantzis and their marriage.  (Scott Decl. ¶ 25).

52.      Later that evening, Plaintiff called Scott requesting a severance package, but Scott

refused.  (Scott Decl. ¶ 26).

## II.      Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

A genuine issue of material fact exists if "there is sufficient evidence favoring the

13

nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

## III.   Discussion

Plaintiff asserts claims for sex discrimination and retaliation under Title VII, age discrimination and retaliation under the ADEA, and wrongful termination, negligent retention, assault, and intentional infliction of emotional distress under Indiana state law. The court addresses Defendants' motion with respect to the federal claims below.

### A.   Title VII and ADEA Discrimination

Plaintiff first claims that Defendants terminated her because of her sex, in violation of Title VII, and because of her age, in violation of the ADEA. To establish a case of discrimination under Title VII and the ADEA, a plaintiff may use either the direct or indirect method of proof. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th

14

Cir. 2002).  Here, Plaintiff proceeds under the indirect method for both her Title VII and ADEA discrimination claims.

Under the indirect method, plaintiff has the burden to establish a prima facie case of discrimination, showing: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly-situated individuals outside of her protected class were treated more favorably.[4]  *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998).  Once plaintiff establishes her prima facie case, the burden shifts to defendant to provide a legitimate, non-discriminatory reason for its adverse employment action.  *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996).  If defendant sets forth such a reason, the burden shifts back to plaintiff to demonstrate that the justification is pretextual.  *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004).  Ultimately, the burden remains with plaintiff to establish her discrimination case.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### 1.     Plaintiff's Prima Facie Case

Here, only the second and fourth elements of the prima facie case are at issue, as Defendants do not dispute that, as a female over the age of 40, Plaintiff is a member of a protected class under both Title VII and the ADEA or that her termination of employment is an adverse employment action.

---

[4] The indirect, burden-shifting method is the same for Title VII and ADEA claims. *Krchnavy*, 294 F.3d at 875.

### a.      Legitimate Expectations

Defendants argue that Plaintiff was not meeting their legitimate performance expectations because customers complained about her; she had a pattern of interpersonal conflicts with other Scott Truck employees; and she interrupted and then stormed out of a management meeting on August 26, 2005.  The crux of Plaintiff's response is that Defendants had no issues with Plaintiff's performance of her job duties and, thus, she was meeting their legitimate expectations.

The court will assume, for purposes of the analysis in this case, that Plaintiff was meeting her legitimate performance expectations at the time of her termination. Plaintiff's interpersonal conflicts with Sasser and her interruption of the management meeting the Friday before her termination dovetail into Defendants' proffered reason for terminating Plaintiff—her insubordination during a meeting to discuss her conflicts with Sasser—and the court will discuss those in the pretext analysis.  *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999) (discussing the legitimate expectations prong of the prima facie case in the pretext analysis where the issues are the same).  Defendants' other evidence of Plaintiff's failure to meet their legitimate expectations—the customer and staff conflicts, except those with Sasser—all occurred while Plaintiff was a dispatcher and occurred a year before her termination.  These conflicts do not evidence Plaintiff's performance *at the time of her termination*, and thus, they are not relevant to the court's inquiry.  *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545–46 (7th Cir. 2002) (emphasis added).

16

**b.      Similarly-Situated Individuals**

Whether similarly-situated employees were treated more favorably is the final element of Plaintiff's prima facie case in dispute.  In support of her sex discrimination claim, Plaintiff asserts that Tim Wilson and John Mulligan are male employees who were insubordinate to Scott and Hantzis but were not terminated.  In support of her age discrimination claim, Plaintiff asserts that Sasser is a younger individual who was insubordinate but not terminated.

In order to be similarly situated, employees must be directly comparable in all material respects, including their performance, qualifications, and conduct.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  "This normally entails a showing that the . . . employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Radue*, 219 F.3d at 617–18.  "In addition, the Plaintiff must establish that the similarly situated employees were treated more favorably *at the time* of the alleged discrimination against [her]."  *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006) (emphasis added).  This inquiry is fact sensitive and requires a consideration of the circumstances as a whole.  *Raymond*, 442 F.3d at 610.

Whether Plaintiff's alleged comparators are similarly-situated individuals hinges on the same fact for all three—whether they were insubordinate but not terminated.

17

Defendants do not dispute that they all dealt with the same supervisor and were subject to the same standards.  Rather, Defendants argue that they were not insubordinate and, thus, are not similar to Plaintiff in all material respects.

### i.     Tim Wilson and John Mulligan

Turning first to Plaintiff's male comparators, Tim Wilson and John Mulligan, Plaintiff argues that they were insubordinate to Hantzis but not terminated.  Plaintiff asserts that Wilson was insubordinate during a meeting between Hantzis, Scott, Wilson and Plaintiff, which was held to address a conflict between Plaintiff and Wilson.  This meeting occurred while Plaintiff was a dispatcher, almost a year before her termination.  During the meeting, Wilson asked a number of times, "Can I leave now?", and he was not terminated.  While this conduct could arguably constitute insubordination under Hantzis' definition, which includes being "inordinately rude,"[5] this conduct occurred almost a year before Plaintiff's termination.  In order to be similarly situated, individuals must have been treated more favorably at the time of the alleged discrimination.  *Keri*, 458 F.3d at 644.  Plaintiff submits no evidence of any insubordinate conduct by Wilson during the time period when she was terminated.  Thus, he is not a similarly-situated individual.

Plaintiff also argues that John Mulligan was insubordinate but not terminated.  The only admissible evidence Plaintiff has of Mulligan's alleged insubordination is the fact

---

[5]  During her deposition, Hantzis was asked to provide a definition of insubordination with respect to John Mulligan's conduct.  She responded: "We did not provide him with a definition other than the fact that if he is inordinately rude or if he refuses to do something you have asked him to do, then it is a major issue."  (Hantzis Dep. 40).

that Plaintiff's husband saw Mulligan yell at Scott "while employed at [Scott Truck]." (J. Everroad Aff. ¶ 8).[6]  Even assuming this conduct constitutes insubordination, Plaintiff submits no evidence of when this incident occurred.  While inferences are drawn in favor of Plaintiff on summary judgment, *Miranda*, 91 F.3d at 1014, she still retains the burden to establish her prima facie case, *Bragg*, 164 F.3d at 376.  Absent any evidence of when this conduct occurred, Plaintiff cannot establish that Mulligan was similarly situated to her at the time of her termination.

### ii.    Jennifer Sasser

In support of her age discrimination claim, Plaintiff argues that Jennifer Sasser, her younger office mate, is a similarly-situated individual because she was insubordinate but not terminated.  Plaintiff asserts that Sasser's insubordinate conduct includes making personal calls, especially regarding her father's health condition, after Hantzis told her that she needs to be more considerate of Plaintiff when making phone calls and should use the lobby phone to make extended calls.

However, Defendants had no meaningful notification that Sasser continued to use the shared phone for family health conversations, nor did they have a meaningful opportunity to determine if that constituted insubordination.  Plaintiff did not tell Hantzis that Sasser continued a pattern of making personal calls in their shared office until

---

[6] Plaintiff also cites portions of the transcript she made from the recording of a conversation between Mulligan and her.  Allegedly, Mulligan admitted to yelling at Scott and Hantzis the same way he spoke to Plaintiff.  However, as the court discussed in Note 1, *supra*, the transcripts of Plaintiff's recordings are inadmissible.

19

Plaintiff interrupted the August 26, 2005, meeting between Scott, Hantzis, and Moore.  At
that point, Plaintiff came into Hantzis and Scott's office, stating: "It's [Sasser], she's at it
again, I have too much going on in my personal life to deal with her."  (Hantzis Dep.
69–70).  It was during the meeting that Hantzis scheduled to address these concerns when
Plaintiff engaged in the behavior resulting in her termination.  Thus, the court does not
reach the issue of whether Sasser's and Plaintiff's conduct was comparable because the
undisputed evidence in this case indicates that Defendants had no meaningful notification
about Sasser's conduct or an opportunity to address it.  *See Radue*, 219 F.3d at 618
(finding plaintiff did not establish similarly-situated prong, in part, because he failed to
demonstrate that supervisor *knew* plaintiff was available and qualified for a position
offered to a comparator) (emphasis added).   Therefore, Sasser cannot be a similarly-
situated individual for purposes of Plaintiff's prima facie case under the ADEA.

Because Plaintiff cannot show that similarly-situated individuals outside of her
protected class were treated more favorably, Plaintiff fails to establish her prima facie
case of discrimination under both Title VII and the ADEA.

### 2.    Pretext

Even if Plaintiff could establish her prima facie case under Title VII and the
ADEA, Plaintiff's discrimination claims fail because she fails to present evidence from
which a reasonable jury could conclude that Defendants' proffered reason for terminating
her was pretextual.  Defendants terminated Plaintiff due to her insubordinate conduct
during the August 29, 2005, meeting.  This constitutes a legitimate, non-discriminatory

reason for Plaintiff's termination.  *See Vukadinovich v. Bd. of School Trustees of N. Newton School*, 278 F.3d 693, 699 (7th Cir. 2002) (finding that insubordination is a legitimate justification for an adverse employment action).  Thus, the burden shifts back to Plaintiff to show pretext.  *O'Neal*, 392 F.3d at 911.

"To show pretext, [the employee] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons."  *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007).  If the employer honestly believes the reasons for terminating the employee, no matter how foolish, trivial, or baseless, then the employee cannot meet her burden to show those reasons are pretextual.  *Id.*  Where, however, the employee casts doubt on the employer's proffered reasons for her dismissal, the ultimate question of whether the employee was terminated as a result of unlawful discrimination is for a jury.  *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997).

As referenced above, Defendants terminated Plaintiff as a result of her conduct during the August 29, 2005, meeting which was held to discuss Plaintiff's problems with Sasser.  During the August 29, 2005, meeting, Plaintiff's behavior included: asking "what am I here for?"; rolling her eyes at Hantzis; when asked not to roll her eyes, responding that "I'm allowed to have facial expressions."; in response to a comment by Hantzis, throwing her arms up and yelling, "Jeez!"; when Hantzis confirmed something Plaintiff said earlier in the meeting, responding, "I don't need your confirmation."; asking, "Is this

a meeting or a chew-out meeting?"; telling Hantzis, "It doesn't matter what I say.  You're going to put a spin on it."; and comparing Sasser's continual phone conversations about her father's cirrhosis to the scene in the movie *Forrest Gump* where the character Bubba rambles on about the different ways to cook shrimp  After this meeting, Hantzis and Scott determined that Plaintiff was insubordinate.  When they determined that Plaintiff refused to say "hello" to Hantzis the next day, they ultimately decided to terminate Plaintiff for insubordination.

Plaintiff argues that this reason is pretextual because a jury could conclude from Hantzis' own definition of "insubordination"—being inordinately rude and refusing to do something when asked to do it— that Plaintiff's behavior during the August 29, 2005, meeting was not insubordinate.  However, this court does not sit as a super-personnel review board "to question the wisdom or business judgment of employers." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).  Plaintiff submits no evidence to call into question Defendants' proffered reason for terminating her.  She does not dispute any of her behavior during the August 29, 2005, meeting.  She only argues that there is a triable issue of fact on whether her behavior constituted insubordination.  Without some evidence that Defendants did not act in good faith, however, Plaintiff cannot show pretext merely on the fact that she disagrees with Defendants' reason for terminating her.  *See Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (finding that plaintiff failed to show pretext where she did not dispute the conduct leading to her suspension, only that such conduct did not warrant a ten-day suspension).

For these reasons, Plaintiff's claims of discrimination under Title VII and the ADEA fail as a matter of law.  Defendants' motion for summary judgment on those claims is **GRANTED**.

### B.    Retaliation under Title VII and the ADEA

In addition to her discrimination claims, Plaintiff argues that she was terminated in retaliation for complaining about sex and age discrimination in violation of Title VII and the ADEA.  In her Response, however, Plaintiff waives her ADEA retaliation claim by failing to identify any statutorily protected activity in which she engaged concerning her age.  *See United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000) ("Arguments that are not adequately developed or supported are waived.").  Thus, Defendants' summary judgment motion is granted on that claim.

The court now turns to Plaintiff's Title VII retaliation claim.  To establish a case of retaliation under Title VII using the direct method, which is the method Plaintiff uses in this case, a plaintiff must prove: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action by the employer; and (3) a causal connection exists between the two.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  A plaintiff may rely on circumstantial evidence to prove the elements of her direct case of retaliation.  *Gates*, 513 F.3d at 686.

In support of her sex retaliation case, Plaintiff argues that she was terminated for complaining about the "sexually derogatory conduct" of Tim Wilson and John Mulligan

23

(Pl.'s Response 23).  With respect to Tim Wilson, Plaintiff argues that Wilson's statements about not liking the number of females being hired at Scott Truck were made in the presence of her supervisor, Jim Moore, and thus constitute protected activity.  The court disagrees.  Plaintiff concedes that she did not tell Scott or Hantzis about Wilson's comments.  Even assuming Jim Moore heard Wilson's comments to Plaintiff, Moore had no role in the decision to terminate Plaintiff, and there is no evidence that he made Scott and Hantzis aware of those comments.  An employer cannot retaliate when it is unaware of any complaints.  *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003).  Thus, Plaintiff's retaliation claim based on Wilson's comments fails.

Plaintiff also argues that she was terminated for complaining to Hantzis about John Mulligan's comment that she was "PMSing" during a conflict they had in July or August of 2004.  Defendants argue that her complaint was not a statutorily protected activity and that she cannot establish a causal connection between it and her termination.  "Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.'"  *Gates*, 513 F.3d at 687 (quoting *Sitar*, 344 F.3d at 727).  Plaintiff's complaint about Mulligan arguably constitutes statutorily protected activity because she indicates her gender is an issue.

However, Plaintiff fails to establish a causal connection between her complaint about Mulligan and her termination.  Plaintiff made this complaint approximately one year before her termination.  *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th

24

Cir. 2003) (finding that a one-year period between the filing of a complaint and the

plaintiff's termination was insufficient to establish a causal connection).  Further, Plaintiff

offers no other evidence that would allow a jury to find that she was terminated for

complaining about Mulligan.  Plaintiff's termination arose out of her behavior during a

meeting to discuss her conflicts with Sasser.  Plaintiff makes no mention of any disputes,

confrontations, or problems of any kind she had with Mulligan at the time she was

terminated.  Considering this lack of evidence in conjunction with the one-year time lapse

between the Mulligan complaint and her termination, Plaintiff fails to establish the causal

connection needed to create a triable issue of fact on retaliation

     For these reasons, Plaintiff's retaliation claims under Title VII and the ADEA fail

as a matter of law.  Defendants' motion is likewise **GRANTED** on those claims.

Because the court has dismissed Plaintiff's Title VII and ADEA claims, the court need

not address Plaintiff's punitive and liquidated damages claims under those statutes.

### C.    Supplemental Jurisdiction

     Because the court has dismissed Plaintiff's federal claims, the court must now

determine whether it will exercise supplemental jurisdiction over Plaintiff's state law

claims.  Where the district court has dismissed the claims over which it had original

jurisdiction, the court may decline to exercise supplemental jurisdiction over the

remaining state law claims.  28 U.S.C. § 1367(c)(3).  However, there are three situations

in which the district court should exercise supplemental jurisdiction even where the

federal claims have been dismissed: (1) where the statute of limitations would bar the

refiling of the state law claims; (2) where substantial federal judicial resources have already been expended on resolving the supplemental claims; and (3) where it is obvious how the state law claims should be decided. *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906–07 (7th Cir. 2007). It is within the discretion of the district judge to refuse to exercise supplemental jurisdiction where the claims over which the court had original jurisdiction have been dismissed. *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008). In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Sanchez & Daniels v. Koresko*, 503 F.3d 610, 615 (7th Cir. 2007).

Here, the court refuses to exercise supplemental jurisdiction over Plaintiff's state law claims of wrongful discharge, negligent retention, assault, and intentional infliction of emotional distress. The statute of limitations does not bar the refiling of these claims, as 28 U.S.C. § 1367(d) itself gives Plaintiff thirty days to re-file them in state court, and, alternatively, Indiana Code § 34-11-8-1 allows Plaintiff three years to re-file these claims. Substantial federal judicial resources have likewise not been expended on resolving the state law claims because they have not gone to trial. *See Williams Elecs. Games*, 479 F.3d at 907 (noting that where the federal claims drop out before trial, the court should relinquish jurisdiction because substantial judicial and party resources would probably not have been expended on the state law claims). Lastly, the appropriate resolution of the state law claims is not obvious, as the parties raise substantial arguments supporting and opposing Plaintiff's state law claims.

26

For these reasons, the court refuses to exercise supplemental jurisdiction over Plaintiff's state law claims. Those claims are therefore **DISMISSED WITHOUT PREJUDICE**.

**IV.     Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment (Docket # 67) is **GRANTED** on Plaintiff's discrimination and retaliation claims under Title VII and the ADEA. The court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims for wrongful termination, negligent retention, assault, and intentional infliction of emotional distress, and they are likewise **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED** this 7th day of August 2008.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Joel Samuel Paul
COLEMAN GRAHAM & STEVENSON
jpaul@cgslegal.com

Susan M. Zoeller
BARNES & THORNBURG LLP
susan.zoeller@btlaw.com